IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2016

**STATE OF TENNESSEE v. MARK TIGER**

**Appeal from the Circuit Court for Madison County**
**No. 15-21   Roy B. Morgan, Jr., Judge**

**No. W2015-01558-CCA-R3-CD  -  Filed April 4, 2016**

The Defendant, Mark Tiger, was convicted by a Madison County Circuit Court jury of aggravated assault, a Class C felony.  *See* T.C.A. § 39-13-102 (2014).  The trial court sentenced the Defendant to five years' confinement.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred during sentencing.  We affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant Public Defender, for the appellant, Mark Tiger.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jerry Woodall, District Attorney General; and Rolf G.S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation involving the Defendant and the victim, L.C. Ross, which resulted in the Defendant's being indicted for attempt to commit second degree murder, aggravated assault, and evading arrest.  At the trial, Dr. Brian Lindsey testified as a medical expert that on August 29, 2014, he treated the victim at the county hospital.  Dr. Lindsey said the victim arrived in an ambulance and in critical condition.  Dr. Lindsey said the victim had massive head and face injuries, including significant swelling, bruising, and lacerations to the mouth and eye regions.  He said the injuries were caused by multiple blows to the victim's face.  Dr. Lindsey noted the zygomatic arch bones on each side of the victim's

face and the maxillary sinuses below each eye were fractured. Dr. Lindsey said that each bone and plate under the eye, the right maxilla area of the mandible, and the left upper ramus area of the mandible were fractured. He said that the plates under the eye were deep inside the skull and that the injuries to the plates indicated high-level blunt force trauma. Photographs of the victim's injuries were received as an exhibit.

Dr. Lindsey testified that the victim was transferred to Vanderbilt University Medical Center because the victim needed treatment by an oral maxillary trauma surgeon. Dr. Lindsey said that the victim might have died had the injuries gone untreated.

On cross-examination, Dr. Lindsey testified that victim had a minimum of five or six facial fractures and that the toxicology analyses showed the presence of cocaine and marijuana and an alcohol concentration of .255. Dr. Lindsey agreed cocaine was a stimulant and could have caused the victim to show agitation, aggression, and paranoia. He said alcohol was a depressant and could have caused sleepiness, somnolence, and respiratory depression. He said marijuana was "in the middle" and could have caused excitement or central nervous system depression. He said that when a patient consumed multiple substances, predicting the patient's behavior was difficult. He agreed, though, it was possible the mixture of substances caused the victim to exhibit aggressive behavior.

Dr. Lindsey testified that if a person were attacked with a knife, the person might sustain lacerations, cuts, abrasions, and puncture wounds and that a knife could cause serious bodily injury. He said choking and throwing a can of food at a person could also result in serious bodily injury.

The victim testified that he had known the Defendant for about ten years. The victim said that on August 29, 2014, at 10:00 or 11:00 p.m., he and the Defendant were drinking alcohol. The victim said that he decided to sit outside his apartment and that the Defendant walked across the street to the Defendant's cousin's home. The victim said that the Defendant returned and accused the victim of stealing something from the Defendant. The victim denied stealing anything and walked to the edge of the street where the Defendant stood. The victim said that the confrontation initially began as a verbal argument and that the Defendant said, "I ought to kill you." The victim said that after the Defendant threatened to kill him, the victim "might have taken a swing" at the Defendant. The victim said that they got into a "tussle," that the Defendant left and returned with a two-by-six wooden beam, and that the Defendant hit the victim with it. The victim said he did not remember much after he was first hit.

The victim testified that he had been drinking alcohol and had consumed cocaine on the night of the incident. He said that he was standing when the Defendant hit him and that the victim fell on the ground and was almost unconscious after the first hit. The victim identified his walking stick and said he probably held it in the air during the verbal argument with the Defendant. The victim also identified a knife he carried and said he was carrying the knife at the time of the incident. The victim identified the two-by-six beam and said it appeared blood was on it.

The victim testified that he was airlifted to Vanderbilt University Medical Center where physicians wired his mouth closed and performed a tracheotomy to assist his breathing. The victim said he was hospitalized until November. He said he was unable to eat solid foods because his mouth was wired closed and noted he lost two teeth as a result of the incident. The victim said he feared for his life after the Defendant first struck him with the two-by-six because the Defendant said, "I'm gonna kill you," two or three times. The victim recalled attempting to grab the Defendant's leg after falling on the ground and being unable to defend himself.

On cross-examination, the victim testified that he was age sixty-six at the time of the incident and that the Defendant was in his fifties. The victim said that he and the Defendant smoked crack cocaine and drank alcohol with Gwendolyn Lyons before the incident. The victim said that he might have been intoxicated but that he could walk. He did not know whether Ms. Lyons was intoxicated. He agreed his apartment complex was a former motel and said his apartment was across the street from a liquor store. He did not know Paul Young but thought Mr. Young's cousin might have been Greg Young, whom the victim knew. The victim said Greg Young lived four houses down from the liquor store.

The victim testified that he smoked marijuana two days before the incident, not the day of the incident. He said that he held up his walking stick to protect himself from the Defendant. The victim denied choking the Defendant during the initial altercation. The victim agreed that Ms. Lyons broke up the initial altercation and that the victim began walking toward his apartment. The victim said that although he did not recall throwing a can of food at the Defendant, he might have thrown it. The victim denied chasing the Defendant across the street. Relative to the knife, the victim said he carried it in his belt and denied entering his apartment to retrieve the knife after the initial altercation. He denied holding the knife in his hand as he approached the Defendant. The victim denied swinging his walking stick at the Defendant. The victim said, though, he was not afraid of the Defendant before he was struck with the two-by-six.

The victim testified that he did not recall his and the Defendant's yelling at each other from opposite sides of the street and that their yelling might have occurred before the

Defendant struck him with the two by six. The victim denied entering the street and said he did not recall the public transportation bus's stopping in the middle of the road. On redirect examination, the victim clarified that fifty to sixty feet separated his apartment and the location where the Defendant struck the victim.

Gwendolyn Denise Lyons testified that she knew the victim and the Defendant and that on August 29, 2014, the Defendant walked across the street from the Defendant's cousin's home and began yelling at her and the victim. Ms. Lyons said the Defendant accused her and the victim of participating in a burglary of the Defendant's home. Ms. Lyons said that the victim and the Defendant began arguing, that the victim entered his apartment and retrieved a can of food, and that the victim threw the can at the Defendant. Ms. Lyons said that the victim began walking toward the Defendant and that the men scuffled. She said that at one point, the victim was on top of and choking the Defendant. Ms. Lyons remembered pulling the victim off the Defendant and calling the Defendant's cousin. Ms. Lyons told the Defendant to return to his cousin's home. She said that the Defendant complied and that she and the victim returned to the victim's apartment complex.

Ms. Lyons testified that she went inside the victim's apartment and that when she returned outside, the Defendant and the victim were arguing again. She said the Defendant and the victim were separated by the street. She said that the Defendant picked up and dropped a brick. She heard the Defendant yell, "If you come across the street, I'm gonna kill you." She said that she attempted to convince the victim to return to his apartment but that the victim began walking across the street. Ms. Lyons said that the victim swung at the Defendant, that the Defendant ducked, and that the next thing she saw was the Defendant "sitting on the ground with [the victim's] head between his legs." Ms. Lyons said that while the Defendant beat the victim, she heard the Defendant say, "B----, I told you I'm gonna kill you." Ms. Lyons said that before she reached the victim, the Defendant walked across the street, sat on the porch, and began drinking a beer. She said she called 9-1-1. He said that while the Defendant beat the victim, the victim was lying on the ground and unable to defend himself. She said the Defendant struck the victim seven to nine times with a wooden beam. Ms. Lyons admitted she had consumed drugs earlier that day but said the drugs did not interfere with her sight or perception.

On cross-examination, Ms. Lyons testified that Paul Young was the Defendant's cousin. She did not know if the Defendant consumed drugs earlier that day but knew the Defendant had been drinking alcohol. She said that the Defendant did not chase the victim after the victim threw the can of food at the Defendant. She said that after she broke up the scuffle, the Defendant went to Mr. Young's home, and the victim went to his apartment. She agreed that the Defendant did not return to the victim's apartment complex and that the victim left his apartment carrying a steak knife and his walking stick. She said the victim did

not have the knife or the stick previously. She said the victim walked to the end of the apartment complex's parking lot and noted the men began yelling. She agreed the Defendant picked up the wooden beam after the victim returned with the knife and walking stick. She noted that the victim was holding the knife in his hands, not tucked in his belt.

Ms. Lyons testified that as the men yelled, the Defendant stood still while the victim walked through the parking lot toward the street. She said that the victim stopped at the end of the parking lot, that the Defendant told the victim to "bring it" to the middle of the street, that the victim entered the street, and that the Defendant began walking toward the victim. She said the victim swung at the Defendant before the Defendant swung at the victim. She did not know what happened to the victim's knife.

On redirect examination, Ms. Lyons testified relative to the initial confrontation that the Defendant got on top of the victim first. She said the victim overpowered the Defendant and began choking the Defendant.

Jackson Police Officer Ricky Stewart testified that he responded to the scene and that he assisted another officer who was "fighting" with the Defendant at a nearby house. Officer Stewart said that the Defendant was resisting and that he assisted the officer in placing handcuffs on the Defendant. Officer Stewart said the victim was lying on the ground and recalled that the victim was not moving and that his head was bleeding profusely.

On cross-examination, Officer Stewart testified that the Defendant was not running or walking away from the other officer. On redirect examination, Officer Stewart identified a tooth he recovered from the scene and said it was found near the victim. On recross-examination, he agreed he did not know if the tooth was analyzed for the presence of DNA.

Upon this evidence, the trial court granted the Defendant's request for a directed verdict of not guilty relative to the evading arrest charge, and a mistrial was declared after the jury was unable to reach a unanimous verdict relative to the attempted second degree murder charge, which was dismissed by the State the following month. The jury, though, found the Defendant guilty of aggravated assault. This appeal followed.

## I      Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support the conviction. He argues that his conduct was reasonable and justified as self-defense. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A defendant commits aggravated assault, in relevant part, when the defendant "[i]ntentionally or knowingly commits assault as defined in § 39-13-101, and the assault . . . involved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). Assault is committed by "intentionally . . . [or] knowingly . . . caus[ing] bodily injury to another[.]" *Id.* § 39-13-101(a)(1) (2014). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(2) (2014).

The record reflects that the incident began by the Defendant's accusing the victim of stealing the Defendant's belongings. The victim and the Defendant argued about the alleged theft, and during the argument, the Defendant threatened to kill the victim. The victim admitted he might have attempted to hit the Defendant. Ms. Lyons saw the victim throw a can of food at the Defendant, which ultimately resulted in a physical altercation. Ms. Lyons broke up the fight, the Defendant walked across the street to the Defendant's cousin's home, and the victim returned to his apartment. Afterward, the Defendant and the victim began arguing from their respective sides of the street, and Ms. Lyons heard the Defendant say he would kill the victim if the victim walked across the street. The victim began walking across the street and attempted to hit the Defendant. The Defendant responded by striking the victim with a two-by-six wooden beam multiple times. The testimony reflects that the victim was unable to defend himself after the first strike and that the Defendant said, "B----, I told you I'm gonna kill you," as he continued striking the victim.

Likewise, the record reflects that the victim sustained bodily injury. The victim testified in detail about his injuries, and his testimony was supported by the photographs received as an exhibit. Dr. Lindsey testified that the victim had at least five or six facial fractures and that the victim might have died had the injuries gone untreated. The victim's injuries were too severe to be treated at a local hospital, and he was airlifted to a major hospital. The victim testified that his mouth was wired closed for months, that he lost two teeth, and that the physicians performed a tracheotomy to assist with his breathing.

Relative to self-defense, Ms. Lyons testified that after the initial altercation and the Defendant's and the victim's retreat to their respective sides of the street, the Defendant yelled for the victim to "bring it" to the middle of the street, that the victim entered the street, and that the Defendant began walking toward the victim with the walking stick and a knife. The Defendant struck the victim seven to nine times with the two-by-six while stating, "B----, I told you I'm gonna kill you." The victim fell on the ground after the first blow, and lay on the ground semi-conscious while the Defendant continued striking the victim. The jury was instructed relative to self-defense, and its verdict reflects that it rejected the notion that the Defendant's striking the victim repeatedly with a two-by-six wooden beam after the victim fell on the ground was justified as self-defense. *See* T.C.A. 39-11-611(e)(2)(B) (2014) ("The threat or use of force against another is not justified . . . [i]f the person using force provoked the other individual's use or attempted use of unlawful force, unless . . . [t]he other person nevertheless continues or attempts to use unlawful force against the person[.]"). Any threat the victim posed to the Defendant ended once the victim fell on the ground. The evidence is sufficient to support the Defendant's conviction, and he is not entitled to relief on this basis.

## II     Sentencing

The Defendant contends that his five-year sentence is excessive. He argues that the trial court misapplied enhancement factor (4) relative to the victim's particular vulnerability because of age or disability. He also argues that the court failed to properly apply mitigating factors (2) and (3) related to the Defendant's acting under strong provocation, the existence of grounds justifying or excusing his behavior, and his acting under unusual circumstances. The State responds that the trial court properly sentenced the Defendant. We agree with the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the Defendant had previous convictions for ten counts of public intoxication, six counts of "family offense-other," reckless endangerment, misdemeanor theft, misdemeanor vandalism, resisting arrest, assault, unlawful drug paraphernalia uses and activities, and a weapon-related offense. The report reflects that in 1995, the Defendant received six months' probation for the resisting arrest conviction and that the Defendant only

reported twice to his probation officer, although he was warned by his probation officer to report more frequently. The report does not indicate whether the Defendant's probation was revoked.

The Defendant reported a ninth-grade education and an alcohol addiction. The Defendant had been attending "Pathways" for "mood issues" at the time of the present incident. He reported having a heart murmur and high blood pressure for which he took medication. He had worked odd jobs since 2007.

The victim submitted an impact statement in which he said he was angry about the attack and that he had experienced memory loss, had undergone several surgeries, and had suffered from stress. He said his face was reconstructed and plates were inserted to support his facial bones. He said that every bone in face was "crushed." He noted that he underwent a tracheotomy and suffered from war-time flashbacks as a result of the attack. He requested the trial court impose the maximum sentence.

The Defendant testified that he sustained injuries as a result of the present incident. He said that two teeth were broken during the fight and were later removed and that two of his fingers were broken. He acknowledged he had problems with alcohol and that he had previously sought treatment. He admitted he was drinking alcohol on the night of the incident but denied consuming any other substances.

On cross-examination, the Defendant testified that he did not mention his broken teeth and fingers during his trial testimony because it slipped his mind. He said that he had problems with his memory and that he had sought treatment at Pathways. The Defendant said that the victim was an Army veteran who learned to fight, that the victim approached him with a knife and a baseball bat-like stick, and that they "went at it." The Defendant said that he only hit the victim three times with the wooden beam, that the first blow knocked the knife out of the victim's hand, that the second blow struck the victim "upside the face," and that the third blow struck the victim on top of the head. The Defendant said that "was it with that fight." On redirect examination, the Defendant agreed he did not testify at the trial.

In determining the Defendant's sentence, the trial court stated that it considered the evidence presented at the trial and the sentencing hearing, the presentence report, arguments of counsel, the nature of the conduct involved, the enhancing and mitigating factors, and the principles and purposes of the sentencing act.

The trial court found that no mitigating factors applied. *See* T.C.A. § 40-35-113 (2014). Relative to enhancement factors, the trial court found that factor (1) applied based upon the Defendant's previous convictions contained in the presentence report. *See id.* § 40-

35-114(1) (2014) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that factor (4) applied without explanation. *See id.* § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"). Likewise, the court found that factor (6) applied based upon the extent of the victim's injuries. *See id.* § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim was particularly great[.]"). The court noted the injuries were inflicted by the two-by-six wooden beam, Dr. Lindsey's testimony that multiple blows of blunt force trauma inflicted the injuries, the victim's multiple bilateral bone fractures and critical condition following the attack, and witness testimony regarding the Defendant's stating, "I'm going to kill you," while the victim lay on the ground.

The trial court sentenced the Defendant as a Range I, standard offender to five years' incarceration based upon the enhancement factors, the Defendant's prior criminal history, and the presentence report. The court found that the Defendant was not an appropriate candidate for alternative sentencing based upon his prior criminal history and his previous failure to report to his probation officer.

Although the Defendant argues that he acted under strong provocation and that his conduct was justified or excused based upon the circumstances of the case, the court noted the Defendant grabbed a two-by-six, struck the victim numerous times, caused extensive injuries to the victim's head and face, and stated numerous times during the attack that he was going to kill the victim. Although the victim fell on the ground after the first strike, terminating any threat by the victim, the Defendant continued hitting the victim with the two-by-six beam, while the victim lay on the ground. We note that after Ms. Lyons broke up the initial altercation and the Defendant retreated across the street, the Defendant antagonized the victim from across the street and threatened to kill the victim. We conclude that the trial court did not err by refusing to apply mitigating factors (2) and (3).

Relative to enhancement factor (4), our supreme court has stated that "the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). A victim may be particularly vulnerable if the victim is "incapable of resisting, summoning help, or testifying" against a defendant. *Id*. Although evidence of particular vulnerably does not need to be extensive, the prosecution bears the burden of proving particular vulnerability. *State v. Poole*, 945 S.W.2d 93, 97 (Tenn. 1997). The evidence must show that the victim's vulnerability "had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting *Poole*, 945 S.W.2d at 96). Although a trial court may give weight to the

victim's age, a court cannot base its applying factor (4) on the victim's age alone. *Poole*, 945 S.W.2d at 98.

The trial court made no factual findings that the victim was particularly vulnerable because of age or disability. The record reflects that the victim was age sixty-six at the time of the incident and that he used a walking stick. No evidence was presented that the victim was unable to walk without the assistance of the stick or that the victim was incapable of resisting, summoning help, or testifying against the Defendant. The victim's trial testimony reflects that the altercation between the victim and the Defendant began as a verbal argument, that the victim probably held up his walking stick during the argument, and that the victim "might have taken a swing" at the Defendant after the Defendant threatened to kill the victim. The victim agreed the men got into a "tussle," and before Ms. Lyons broke up the altercation, she saw the victim overpower the Defendant, climb on top of the Defendant, and choke the Defendant. Furthermore, Ms. Lyons testified that after she broke up the altercation, the victim went to his apartment and left the apartment carrying the walking stick and the knife, which he did not have previously. Ms. Lyons said that just before the Defendant struck the victim with the two-by-six, the victim swung at the Defendant and that the Defendant ducked. As a result, the record does not reflect that the victim's age or physical condition had any bearing on his ability to resist the crime, summon help, or testify against the Defendant. We note that the expert medical testimony did not reflect that the victim's injuries were enhanced because of his age. Rather, the evidence shows the victim sustained extensive injures, as any victim would have sustained, after being struck numerous times with a two-by-six wooden beam. Therefore, we conclude that the evidence does not support a finding that the victim was particularly vulnerable and that application of this factor is not supported by the record.

Although we have concluded that the trial court improperly applied enhancement factor (4), the Defendant is not entitled automatically to relief. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.* The Defendant received a within-range sentence, and the record reflects that the trial court complied with the purposes and principles of sentencing. The court properly applied two enhancement factors and weighed heavily upon the Defendant's prior criminal history, the nature of the offense, and the victim's extensive injuries in determining the Defendant's sentence. We note that the victim suffered at least five or six facial fractures and that Dr. Lindsey concluded the victim might have died had his injuries gone untreated. The trial court did not abuse its discretion by imposing a five-year sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's conviction.

_____
ROBERT H. MONTGOMERY, JR., JUDGE